*1077 OPINION.
MuRdock:
The first issue is whether the petitioner’s basis for depreciation upon the depreciable assets which it acquired on January 1, 1915, from Ohio was, in the beginning, $18,799,415, as claimed by the petitioner, or was $10,191,412.14, the amount used by the Commissioner in determining the deficiency.[1] The petitioner claimed certain deductions for depreciation on its returns and the Commissioner disallowed the part thereof which was computed upon the assets acquired on January 1, 1915, from Ohio. He allowed the deductions claimed upon the remaining assets of the petitioner and approved the 5 percent rate used by the petitioner, which was the same rate used in all prior years. The reason which he gave for disallowing the deductions upon the assets acquired from Ohio on January 1, 1915, was that the petitioner, through deductions for depreciation and retirement losses on those assets in years prior to the taxable years, had recovered an amount in excess of $10,191,412.14, and, consequently, the petitioner was not entitled to further recoveries on those assets. The amount actually recovered in prior years *1078 through depreciation and retirement losses on those assets is not disputed. The Commissioner was apparently satisfied that the petitioner had applied the 5 percent rate to the correct adjusted bases in computing deductions which it claimed for the two taxable periods here involved if the original cost was $18,799,415. The parties are agreed that the cost .to the petitioner of the assets obtained by it on January 1, 1915, was the value of the stock given in exchange for them. They also agree that the petitioner’s basis for depreciation on the depreciable assets obtained in that exchange is that portion of the total cost of all of the assets which may properly be allocated to the depreciable assets. Thus, if the petitioner establishes that cost, it has met its full burden of proof on the first issue. This conclusion is stated advisedly as the only fair and reasonable one to be drawn from a study of the notice of deficiency, the pleadings, the briefs, and the statements and attitude of counsel during the trial.
The Commissioner stated in the notice of deficiency that $10,191,-412.14 was the cost, less depreciation, of the depreciable assets to Ohio, as shown by the books of Ohio, at the time Ohio transferred those assets to the petitioner. The evidence shows that the book value of the assets, as shown by the books of Ohio at the close of 1914, was somewhat less, but the difference will in no way affect the result in this case.
The petitioner paid for the assets with all of its own stock. That stock was to be distributed to the Ohio stockholders. There is evidence of sales of the stock of the petitioner at prices in excess of par near the critical date of January 1, 1915. Those sales are substantial evidence that the stock which was transferred to Ohio in exchange for the assets was worth at least $20,000,000. There is also evidence in thej record to indicate that the value of the assets transferred to the petitioner at that time was at least $20,000,000. The Commissioner conceded in the notice of deficiency that the total value of all of the assets paid in for stock on January 1, 1915, probably was $20,000,000. It is fair to assume that the stock was worth as much as the assets which were behind it. Swiss Oil Corporation, 32 B. T. A. 777, 786, 787. The petitioner does not claim a total cost in excess of $20,000,000, and it may fairly be concluded for the purposes of this proceeding that the cost to the petitioner of all of the assets which it acquired on January 1, 1915, was $20,000,000.
However, error in the determination of the Commissioner on this first point is not shown by the conclusion that $20,000,000 was the cost of all of the assets. There remains the question of the cost of the depreciable assets, or the question of what part of the entire cost may properly be allocated to the depreciable assets. The Commissioner apparently attributed to “going concern” value the dif *1079 ference between $20,000,000 and $10,191,412.14. He would allow no depreciation based upon the cost of “going concern value” on the ground that it represents the cost of an asset not subject to depreciation. However, error in his determination may be shown in several ways. For example, it might be shown that there was no intangible value such as “going concern value” or good will attached to or inherent in the pipe line system which the petitioner obtained through the purchase from Ohio on January 1, 1915, or it might be shown that no part of the consideration was paid for any such intangible value, or it might be shown that the intangible value disappeared ratably as the economic life of the tangible assets gradually drew to a close.
The parties to the transaction whereby the pipe line was transferred to the petitioner considered the question of the value of the various assets to be transferred in arriving at the figure of $20,000,-000, yet they did not mention any intangible value or attribute any part of the value to intangibles. The petitioner, after it received the assets, spent a great deal of time and effort in preparing a careful inventory and in appraising the items of that inventory for the purpose of distributing the total cost to the various assets on its books. There was never any mention in that process of any intangible asset, and no part of the cost was ever allocated to any intangible asset. While we are not called upon to approve or disapprove of each step in the appraisal, and while there may be some parts of the process about which we have some doubt, nevertheless, after due allowance is made for all uncertainties, the inventory and appraisal strongly indicate that the value of the tangible assets was at least $18,799,415. The evidence also shows that no part of the purchase price was paid for intangibles and, further, that any “going concern value” attached to the line exhausted with the line itself. Thus, even if there was some valuable intangible asset transferred, nevertheless it is proper to allocate to the tangible assets a cost of at least $18,799,415. The evidence supports and the Commissioner does not seriously question the method of allocating the cost of $18,799,415 to the various depreciable assets which the petitioner used on its books and in computing the deductions in question. Hazeltine Corporation, 32 B. T. A. 4, 19; affd., 89 Fed. (2d) 513, 520. Decision on the first point must be for the petitioner.
The Commissioner, by amended answers, has made two contentions in regard to the rate of depreciation on all of the depreciable assets of the petitioner. The first amended answer claimed that a rate of 3% percent was proper instead of the rate of 5 percent which was used. He filed a second amended answer at the close of the hearing in which he alleged that if the 3% percent rate was not to be applied *1080 as a composite rate to all of tlie depreciable assets of the petitioner, then a rate of 2 percent should be applied to buildings and a rate of 2y2 percent should be applied to line pipe laid, line pipe construction, and tanks. He made claim for the increased deficiencies which might result and he recognizes that he has the burden of proof to establish the correct rates.
Witnesses for the petitioner have testified, and the petitioner concedes, that certain parts of the plant of this pipe line company have a physical life of substantially more than 20 years. The petitioner contends, however, that when they form a part of a pipe line, the entire cost of the investment must be recovered over the economic life of the pipe line. The petitioner estimated the useful life of its properties in 1915 in the light of the best opinion and experience then available. The resulting rate was the rate of 5 percent. The petitioner has consistently used that rate ever since. The Government seeks to change it in the fifteenth year of its use. The evidence indicates that a life of 20 years was a. reasonable prediction in 1915 and that nothing happened in 1929 or in the first four months of 1930 to justify a change in that estimate. Deductions for depreciation are dependent upon estimates and can never be absolutely accurate. Commissioner v. Niagara Falls Brewing Co., 282 U. S. 648. Cf. Utah Power & Light Co. v. Pfost, 286 U. S. 165, 190; Cohan v. Commissioner, 39 Fed. (2d) 540; Mount Hope Cemetery Association, 37 B. T. A. 671. There was reason to believe in 1929 and 1930 that the line might possibly have some further use for transporting products of others, but the evidence is not strong enough to justify a change in the method consistently used by the petitioner to recover its capital investment. It is not necessary in this proceeding to hold affirmatively from the evidence that the 5 percent rate is proper. The burden was upon the respondent to show that that rate was improper and we have no hesitation in saying that the evidence does not show error in the use of the 5 percent rate.
The final question is whether or not the Commissioner erred in disallowing deductions for retirement losses on all of its assets. One reason for the disallowance of those deductions was that the “value” of the assets acquired on January 1, 1915, was only $10,191,412.14, and that “value” had already been recovered tax free in prior years through deductions for depreciation and retirement losses. We have held, in deciding the first issue, that the cost of those assets was $18,-799,415. The only other reason timely advanced by the Commissioner for disallowing the deductions for retirement losses is that the 5 percent rate is a composite rate, and where a composite rate is used, deductions on account of losses for retirements are improper. J Obviously, if a rate of 5 percent is consistently applied to the same,basis for a period of 20 years, the annual deductions will equal thé cost *1081 of the property. However, if the basis is reduced as assets are retired, the entire cost of the assets can not be recovered unless the depreciated cost of the retired assets is allowed as a deduction at the time of their retirement. This is because the subsequent deductions will be 5 percent of a basis which does not include the cost of the retired assets.
The method of recovering its capital investment which the. petitioner has consistently used since it acquired the pipe line from Ohio has been to apply a rate of 5 percent to the cost of the different classifications of assets in each district. It maintains a separate reserve account for1 each separate class of assets in each district. In case any asset was retired or replaced during the period from January 1, 1915, through April 30, 1930, the undepreciated balance of the cost of that asset remaining on the hooks at the time of the retirement was written off, and the amount written off, reduced by salvage, was taken as a deduction in the year of the write-off as a loss upon retirement. The original basis was reduced as amounts were written off. This method, consistently applied, will return to the taxpayer the exact cost of its assets over a period of 20 years. It will not result in any double deduction, it will not fail to return any part of the cost tax free, and it will not distort income for any year. The statute allows a taxpayer deductions for losses upon the retirement of assets. It is, of course, proper to consider the method of computing depreciation and to see that double deductions do not result. There is in the present case no distortion of income resulting from double deductions in this' connection. On the contrary, if the retirement losses are disallowed, the deduction for depreciation would have to be increased in order to reflect income correctly. Applying a rate of 5 percent to the original cost of the assets acquired on January 1, 1915, would give the petitioner a deduction for 1929 of $939,970.75.[2] The petitioner is only claiming a deduction of $537,400.58 as depreciation on those assets, and a deduction of $260,763.73 as retirement losses on all of its assets. The total which it is claiming is $798,-164.31, or $141,806.44 less than it would be entitled to deduct for depreciation alone on the original assets were it to apply 5 percent to the cost of those assets. The petitioner is entitled to the deductions which it claimed for retirement losses for the two periods here involved.
The Commissioner in his brief has made a further argument for disallowing the retirement losses. The petitioner extended its properties and made additions to its old properties after January 1, 1915, from time to time. It capitalized the cost of each addition and applied the 5 percent rate thereto in computing depreciation. The con *1082 tention of the petitioner has been that the economic life of all of its assets will end with the close of the year 1934. The Commissioner therefore argues that depreciation on the additions to the plant after January 1, 1915, should have been computed at a rate in excess of 5 percent, which was not done, and, therefore, the retirement losses in the taxable periods before the Board are excessive, since they were computed upon an excessive basis from which the sufficient depreciation for prior years had not been deducted. The record does not disclose the amount of retirement losses applicable to the assets acquired on January 1, 1915, the assets added to the original pipe line after that date, or to the assets constituting pipe line systems located in other states. Consequently, the Commissioner urges that the entire deduction for retirement losses for each of these periods must be disallowed. He also points out that the method used by the petitioner in computing retirements of laid pipe was faulty in that there again the basis upon which the retirement losses were computed was excessive due to inadequate deductions for depreciation in prior years. These arguments were raised for the first time in the respondent’s brief. The petitioner had no reason to believe at the time of the trial that evidence to rebut such arguments would be expected, and it contends that the burden of proof would be upon the Commissioner. Theoretically, the petitioner may have been entitled to larger depreciation deductions on some of these items in the past. However, it has consistently followed its method of computing depreciation deductions and retirement losses. The evidence does not show that actually it deducted less depreciation in prior years than was allowable. It is possible that the excess, if any, in the basis is so small as to be negligible. The petitioner is entitled to a large part, if not all, of the deductions which it has claimed. The losses which it has claimed should not be denied because of this belated argument of the Commissioner.

Decisions will he entered for the petitioner.

 The Commissioner, in the notice of deficiency, refers to $10,191,412.14 as the “market value” of the depreciable assets on the basic date. Their basis is their cost, v Inch may differ from their market value.

 Sales of some of the assets might have reduced the basis, of course.